Case number 15-3011 et al. United States of America v. Yahya Ali Zaitar, also known as Abu Rabha, also known as Yahya Ali Dawad Zaidar, appellant. Mr. Sussman for the appellant, Ms. Heller for the appellate. Good morning. Good morning, Mr. Sussman. Representing criminal defendants, at least in my view, is never an easy task. The job becomes substantially more complicated when that defendant is foreign speaking, does not speak English, and perhaps the case gets even more complicated when that person speaks some English. Then the lawyer is never certain exactly what his client understands and what his client doesn't understand. And moreover, lawyers are freed often, or feel free, to dispense with interpreters and the logistical nightmare of bringing an interpreter, hiring an interpreter, bringing an interpreter to jail. And clearly this was the case with regard to Mr. Zaitar. Many of the conversations between he and his counsel, Mr. Zaitar was Arabic speaking, many of the conversations between he and his counsel were in English without the benefit of an interpreter. His English was – he had been extradited to the United States. He arrived not speaking one word of English. He had never been in the United States or to anyone's knowledge an English-speaking country. He was from Lebanon. And it's hard to believe that in the several years he was here that he became fluent enough in English to understand legal terms and the significance of those legal terms. One thing I was curious about was there was a lot of focus on the language but not much discussion about his understanding of the legal system and how that would factor into how he understood representations or statements from the attorney having no familiarity with this legal system. Right, and I think you add to that the equation, the fact that many people come from legal systems that are far different from ours and the expectations of how the system works. And the integrity of the system, perhaps even, is a far – is far different than a criminal defense. Or what the role of a lawyer's statements about what I think will happen has been before this judge before can mean. But that hasn't been the argument here, so I take it there's nothing I can do with that consideration. Well, I think it is in the argument. I think the question is that there becomes a significant question between promise and prediction. I don't think even Rosetta Stone guarantees that, of course, we'll allow you to make those distinctions. Well, I understand that this was the argument you're making. I – that you made in the brief. The brief lists the question presented. Question number one, where the plea was not entered into knowingly and intelligently because his attorney provided ineffective assistance by promising that he would receive an 81 sentence. And number two, defense counsel promised the appellant an 81 sentence to induce his brief guilty. And everywhere in the blue brief, you rely only on ineffective assistance of counsel and only on the district court making clear error in concluding that there was not a promise. Likewise, in the reply brief, that's the only thing I find, that you're relying on an argument that the – that it was, quote, implausible, that the district court's evidentiary conclusions are implausible and have resulted in manifest injustice. Am I wrong about that? No, I don't think you're wrong, but I think – I think the thrust of the argument is that there was a miscommunication. I think that was – No, I'm sorry. That's what I'm asking you about. I don't see that as the thrust of the argument that you made in the brief. The argument you make in the brief is that defense counsel promised – what was it, 80 months? Something in the 80 to 87 months range. And the district court found that defense counsel did not make that promise, and you argue that was clear error. I don't see an argument that there was – that there was – you have another ground here. So if we decide that there was no promise under whatever our standard of review is, isn't that the end of your ineffectiveness claim? No. Well, can you point me where in the blue brief you made another argument? I think the argument was made in reply. I think the argument was made that in these situations, to distinguish between promise – the slippery distinction between promise and prediction – So you acknowledge you didn't make that argument in the – I didn't make it in the initial brief. I think it was made in reply. Normally we consider it forfeited if it's not made until a reply. I don't think it would be appropriate. I think that's the central argument that Mr. Zaitar is now making before this court. I think that the court is faced with a situation where the court can be asking or should be asking, what's wrong with this picture? And what's wrong with what happened to – So it's not an ineffective assistance problem. It's a different kind of problem? Well, I think it borders on two things. It borders on ineffective assistance because I think it's incumbent upon a lawyer, particularly in a foreign-speaking situation, but in every situation. But I'm confining it to a non-English speaker in this particular situation. It's incumbent upon the lawyer in some fashion to make it crystal clear that whatever his predictions are, they are just predictions. Yeah, so the lawyer in this case said that he did that. Now, that's a different question than whether the other side understood it. But the ineffectiveness has to be what the lawyer provided. The lawyer's testimony was repeatedly it was explained. And in the plea colloquy, there was a court-certified interpreter who interpreted the words. The judge asked, was there any promise of a sentence? And he said there wasn't. And there was an interpreted plea agreement, which he signed, which said there was no other promise. All that's fact, right? That's right. Okay. So there can't be – I'm having difficulty seeing this as an ineffective – this aspect of your claim as being an ineffectiveness argument. Well, I think that I would adhere to the argument that it's basically the lawyer's responsibility – and I'm confining this to foreign speakers, not across the board, although I think that it exists across the board – to make it very clear when you're talking about predictions, it's a very dangerous thing to be talking about. Clients always want prediction, but it's very dangerous for the lawyer to get in there because of the inherent – in this particular case, if you'll let me back up for a second, Mr. Zaiter had been in this country for – I got all the facts. I understand that. I'm trying to figure out what the doctrinal hole we're trying to fit this peg into. And the briefs are about ineffective assistance of counsel, and the opening briefs are about a promise. You seem to be withdrawing from the argument about a promise and instead saying the problem is a misunderstanding. So now my question is, what is – does effective assistance of counsel have to mean that regardless of how much the lawyer did, if the defendant says he doesn't understand, the lawyer has been ineffective? If the defendant says he doesn't understand later, after he's already accepted a plea in which he said he did understand. Well, this Court has held reputedly in almost all cases, in some of them mine, that a satisfactory Rule 11 plea trumps any claim thereafter. And in this case, I'm forced to admit that the Rule 11 colloquy was pristine. There was nothing wrong with it. Including with a translator. There was an interpreter at that aspect. But I think that it belies the reality of the entire equation, which is the context between attorney – there were multiple attorneys, the Court might recall. The attorney employed some associates to speak in English without the benefit of an interpreter. And the essence of it was an incredibly upbeat, optimistic kind of presentation, in which Mr. Zaitar, after waiting – as the Court says, you're familiar – after waiting three, three and a half years, decided at the last minute on the relative eve of trial to plead guilty. So there must have been a game-changer somewhere along the way. And I'm submitting to the Court that the game-changer was the attorney's inability in this case, which I couch as ineffectiveness, to communicate to Mr. Zaitar that what he was talking about was crystal ball gazing. It wasn't – it's not the law. So what would an effective attorney have done? Say yourself, what would you have done? Mr. Colburn said that he repeatedly, every time he saw the person, told him, there's no promise, can't guarantee this, up to the judge. What else should he have done? So that I measure what an effective counsel would have done, what else should have been done? I would say, and I would confine this only to a foreign-speaking client whose language – his original language is not English – that a document or a letter be written that makes it very clear in his language that numbers you've talked about are just predictions only and that there is no promise as to what the court will do. So that's exactly what the plea agreement, which was translated into Arabic, said. Exactly. Well, then the Rule 11 Qualiqui, in your view, is going to – No, no, I'm asking – I'm asking – I think the plea agreement is not good enough, signed by the defendant and the prosecutor and the defense counsel. I think the context of this situation, in the case of a foreign-speaking foreign national, and I think the judge was on spot on that, was that their expectations about the criminal justice system, they enter the equation with potentially quite different expectations. It's a cultural, not a language, argument. Well, they're both, but I'm still asking what – You're talking about an English-speaking country that had the criminal law practices that you're alluding to. Well, that's not – if I understand – This is not a hostile question. No, no, no, I was just trying – there were English-speaking countries where the judicial – Assuming an English-speaking country with the sort of criminal law system that you're hypothesizing, the same failure of communication would be likely. Potentially. So you have a double whammy here. You've got the foreign language and the lack of familiarity and maybe, you know, I don't know how many legal systems he's seen where – I mean, it's easy to imagine that the problem here is that in plenty of places around this world, when a lawyer says, okay, okay, the judge is going to say this, and this is, you know, the judge, it's not a promise, but trust me, it's going to work out just fine. And then the over-eager associate comes in and goes, oh, been friends with the judge for a long time. And so I think where the issue here is – This is hypothetical. Yeah, yeah, yeah, yeah. But I think we can imagine how these, you know, someone who's totally unfamiliar with the legal system that has this kind of integrity could misunderstand it. But then I think the question has to become in deciding whether there was ineffectiveness, sort of from whose perspective do we ask whether there was a promise. Did the lawyer – I think the lawyer didn't think he was making a promise, was being – making his best educated guess, trying to communicate the education and judgment and experience that he had, but knew better than to make a promise and didn't do that. So from his perspective, there was no promise. But – and that seemed to be how the district court was looking at it. From – I take it your argument is that from Mr. Zeitar's – I'm sorry, did I say that right, Zeitar? That's correct. From Mr. Zeitar's perspective, those same words sound like a promise, either from his background, his language, or he didn't have the sophistication. And so the ineffectiveness – is your ineffectiveness argument that the lawyer needs to be more sensitive, sort of a double whammy of language and culture? But then how is that administered as a matter of law? How does that opinion get written on ineffectiveness? I think I would suggest that from this point forward and applying it to this case, that at least – and I'm confining this only to non-English speakers, because I think the potential of confusion, for the reasons that you've talked about, are the greatest. In those kinds of cases, I would demand something more than just the Rule 11 colloquy with its legal terms. The question is if a statement in the defendant's language saying that I have received no promises is not enough, you seem to be setting up a proposition that's not falsifiable. They're going to get it wrong no matter what it's said. So, I mean, it almost ends up in a rule that foreign defendants can't be guilty. Well, I don't think it goes that far. I think you can never draft around subjective intent if some guy has expectations that are just unrealistic or not consistent with the reality of the situation. But what you can do is create an objective measurement of what the lawyer said. Now, lawyers aren't probably, myself included, are not that anxious to get into what we might have predicted or what we might have discussed. But sometimes that kind of discussion, especially if it changes the game, becomes very vital to the equation of whether there was a true and honest communication to the client. I want to get back to the question of whether there is an effective assistance counsel here. And the first question is whether the advice or the assistance was not up to a reasonable standard of competence under Strickland, right? Your argument is that a reasonable standard requires, in the case of a foreign defendant, that the lawyer's prediction or statement itself be put in writing in the original language. Is that right? That's correct. Has any court ever said that? No. Has any bar association ever said that? Not that I'm aware of. Have you ever done that? You. Have you personally ever done that as a lawyer? Yes. And is your understanding that that is the standard of care in the community, that your predictions, not in the plea agreement but separately, are put into writing in the foreign language? Or you can't make a representation that way? No, I really can't. So if that's true, then doesn't that end the first Strickland prong? The first prong of Strickland doesn't require that you anticipate what a court might later decide is the highest possible standard. It only asks for a competency standard. Well, I think that Strickland has interpreted over the years as a flexible standard. The standards change as to what lawyers should do and what lawyers shouldn't do. I'm not turning over the requirements of an attorney in terms of representation. I'm looking at a very, very narrow subset. I mean, it gets very difficult when we have defendants who speak, I don't know if I can call it a niche language, Bulgarian or Mandarin. We've pretty much gotten Spanish-speaking attorneys and things like that, languages we see all the time. But it's far different when we're talking about attorneys who have no idea what the interpreters are telling or saying literally. Why should we think that it would be more likely for the client to understand if the lawyer hands him some piece of paper with it written in secret because that's an attorney-client communication as compared to the public document of the plea agreement and the in court with the judge statement. Has anybody promised you anything? Translated into Arabic and the answer, no. Why isn't that the right way? That is the way that the system normally works. And why isn't that the way to guarantee this problem as best as is possible? Well, the reason I think is if the client thinks either for language problems or for cultural reasons that he's going to be guaranteed a certain sentence or a certain deal, if you will, then to stand up in court and talk about that might well be in his mind undermining that deal. And that's why I think that's exactly what Zaitari testified to. That, of course, throws Rule 11 out completely because that applies in every case. In every case a defendant could feel that his client has told him, his lawyer has told him, don't worry, I know the judge, it's all corrupt. And then when you go into Rule 11, you say no deals, no promises. And then we would say, well, that's no good because that's something that happens in court and there's no reason for clients to believe the court. Well, where we differ is I see this as a totally different situation when you're talking about the non-English speaking client. I think that that's a wholly other, if you will. I see I've exceeded my time. Can I ask a question? Sure. That question, do you know when your client's due to be released? Not that long. Ms. Heller was telling me probably in four or five months, something like that. I thought it was February 15th. That might be. I haven't checked it that recently. Do you dispute that that would moot this case? No, because the consequences of conviction would have an effect on his ability to enter or reenter the country. But you're not, I had, this was an argument not about innocence, but it was about the length of the sentence, right? Well, procedurally it would, he asked to withdraw his claim and get back. Where do we go from here? That's my question. If you win, he goes to trial, right? Potentially. Well, his previous lawyer said that he has no case. He has an awful case.  Does he, does your client understand that if he loses this appeal, he gets released in February? If he wins this appeal, he goes to trial, which certainly won't occur before February. And if he's convicted, he gets a sentence, whatever the sentence is. It may well be longer. Does he fully understand that? I believe so, and he's instructing me to go forward on this matter. So the claim of the judge, the district court judge, that what he really wanted to do was to go home as soon as possible, that's what the district court followed, right? And that's what his previous lawyer said. He wants to go home to Lebanon as soon as he can. That's false. That must be false because the way to get home as soon as possible is to lose this case, not to win this case. Well, I'm kind of doing a good job in that respect. Touche. I understand, I understand the problem. And if the court, to assist the court, if the court wants another inquiry made in appropriate language before a decision comes down. But part of, even if there were an effective assistance on the first, Strickland-Prawn, the second question is whether there's prejudice. And to get to the prejudice question, the standard question is, would he give up his plea agreement and go to trial? Is that really what he wants, right? And he has to show that that's really what he wants. And our normal test of whether that's really what he wants is, what's his underlying motivation? And among other things, what's the chances that he's going to go to jail for a longer period? Right now we know he's going to be released in February. Right. Seems pretty risky. There is some risk in terms of the, he'll never be able to reenter this country with the conviction. He may have collateral consequences in terms of payment, in terms of other things. They're probably not that realistic. But that's not what, but his argument, his reason, your explanation of his reason is not that he doesn't, is not about conviction. It's about how long a sentence he's going to get. Isn't that right? How long a sentence he had gotten. Yes, yes. But it wasn't that he was trying to avoid conviction. It was that he wasn't making an argument about innocence. Right? There's no misunderstanding about his position at the sentencing where he said he was guilty. Right? No misunderstanding about that. What he said was what he said. There's no claim now that he really meant innocent when he used the word guilty, or that somebody persuaded him to say he was guilty when he was really innocent. There's no argument about that. No. The claim is that he forfeited a valuable constitutional right unknowingly or by virtue of the representation. Unknowingly because he thought he was going to get a smaller sentence than he actually got. That's obviously correct. Sure. Okay. Further questions? Thank you. Good morning. May it please the court, I'm Kirby Heller for the United States. As Judge Garland noted, this is a case about ineffective assistance of counsel. That's the claim. So, of course, it is judged from the perspective of the attorney. Why is that? I'm just curious as to why we come up with a system that looks from the lawyer's perspective as opposed to the whole idea is to protect the defendant. Why is it that we look from, why don't we factor in at least how a client would understand? I think we do that if the client was a five-year-old child. Would we all have the same reaction? Oh, yeah, don't worry, don't worry. I know and I've got a lot of experience. Of course, it's not a promise. We don't go, come on. I'm not equating him with a five-year-old child. I'm just saying we factor in. We need to sometimes factor in. A lawyer has to factor in how the message is going to be received. It seems to me to be a lot of the action in this case. Someone who didn't speak the language and may not have been familiar with how our legal system works. I don't disagree, Your Honor, that the attorney in determining whether he is giving effective representation, because that is the first prong of the Strickland test, should consider who he's talking to. So if, for example, an attorney was speaking to his client only in English and his client didn't understand it, and he said, this isn't a promise, but this is my prediction, and he knew that that was not going to be understood or he said it in a way that was not going to be understood, that would be a factor in determining whether his performance was deficient. But we're still looking at whether his performance was deficient. Oh, yeah, no, I totally, yes, absolutely. I get the look at that, but I guess it sounded to me from the district court's analysis here that the district court was focusing very much on what came out of the lawyer's mouth and obviously the judge's mouth at the Rule 11 College for purposes of ineffectiveness, what came out of the lawyer's mouth and not what was going into the client's ear. Was a mistake made in that regard or not? Well, I think that issue was actually focused on in the hearing that the attorneys testified not only to the fact that they repeatedly told him that this was not a promise, we don't know what the district court can do, it's not bound, you know, we're optimistic, but also about their view of his understanding. In fact, they said, we don't know what's in his head, but everything that happened suggests or indicated to us that he understood. Of course, some of the discussions were— What did they have? Maybe I missed something in the record. What did they have that indicated, as opposed to going, uh-huh, uh-huh, uh-huh, which clients, we forget how alien and scary the legal system is to people who aren't lawyers and are not familiar with it, let alone from a foreign land, what did they have that showed that he got, he really got it when he was told, you're exposed here, you're exposed to a lot higher. Well, there was testimony, if you look at the joint appendix at pages 86 and 88 by Mr. Coburn, first of all, talking about his English. His English was very good. My sense was he clearly understood me. He was unusually articulate. We have extensive conversations in English. He was very intelligent. He wasn't shy about sharing his views, often in English. It was clear that he understood what I was saying and what he was saying. He understood the guidelines. Mr. Lew testified to the same thing. The court even said, it's clear you've learned a lot more than English in your time here. So the attorney's perception was that he understood what he was saying. For example, another example, Mr. Lew said when he came back with the final agreement that Sorry, this is Mr. Coburn, but you just were That was Mr. Coburn. Mr. Lew, because I know Mr. Lew is the one the district court credited. I'm sorry? Mr. Lew is the one district court found most credible, correct? Completely. Not the other ones, but really But Mr. Lew's testimony confirmed what Mr. Coburn had said, so that he described how when the attorneys presented the final plea agreement to the defendant, he said, can't you get an agreement to, I think it was 87 months? And Mr. Lew said, no, they're not going to have that. The negotiations with the U.S. Attorney's Office, though, right? It's as though you've got a plea agreement and you're trying to get him to accept it. That's different. Well, I guess my point is Mr. Lew is explaining the plea agreement. There's not just a passive, uh-huh, uh-huh. The defendant is saying, can you get them to promise this? And Mr. Lew said, no, I can't. So all of this was discussed. No, I can't. But we think you're going to get even below that. Anyhow, got lots of experience with this judge, not to worry. Really, everyone else got below the guidelines range. Don't worry about what the U.S. Attorney's Office is willing to agree to. And how is somebody who's not a lawyer supposed to weigh that in? Were those words said? No, I was going to say that was not a testimony from the attorneys. The attorneys said, we made it clear repeatedly we can't promise. We're optimistic we're going to make these arguments. No, I'm just putting it in. Their optimism, I mean, optimism comes in words to lawyers. Well, and they testified that from where they sat, and that's all they can do, they believe that he understood that. And that's not ineffective. What do you make of the district judge's comment? After years of experience with this desire to argue, does the court's view of this testimony reflect an exaggerated representation of events? These exaggerations were not rooted in a truthfulness. Rather, as a result, a non-fluid English speaker can't be emphasized as a point to mature understanding in a foreign language. So that seems to be almost a statement that, as I've heard, did not really understand what was going on. Well, again, that gets to the question of what did the attorneys do and to the best of their ability, and how did he interpret that? They can't prevent him. No, undoubtedly. There's no foolproof system. I guess the only question, of course, is the whole question of what the standard of representation is, whether under the circumstances something more was suitable. I'm wondering whether this is an effectiveness question at this point or just a straight voluntariness question. That is, the overarching question about manifest injustice has to be that somebody not knowing, not understanding, not voluntarily entered into a plea agreement. One way you show that is by showing ineffective assistance. The problem for the defendant here is the Strickland test is an objective test, expressly. That's what the Supreme Court said, not a subjective test. So the question really is what was said under the circumstances is what was said enough. But there is still an overarching question about voluntariness and about knowledge, and normally we ask that question in light of the Rule 11 colloquy. But if we take the hypothetical and just expand it from what Judge Williams was saying, let's say everybody agreed that he was 100% certain he was getting 87 months or whatever it was, and that was it, nothing else. And then he went in and pled with that understanding. That would make it an unknowing plea, wouldn't it? If the fact supported that, but what we have, of course, well, first of all, that's not the claim. But to answer your question, what we have is a Rule 11 colloquy that hasn't been challenged in any way and goes by the book. No, but we've also got, as Judge Williams pointed out, is a district court finding that there's a guy who could speak language and had a working ability in it, but didn't get the nuance at all, the exaggerations. He didn't quite, you know, didn't understand limitations within the language. I think that's the only way to understand a statement about his exaggeration, the communication details of it. And since this seems to be a case all about not can you translate these words, but understanding the context, the framing, and the nuance and intonations that come with statements, isn't that a problem? I'm not sure there's anything else you could have done in this case. You have a plea agreement that spells out exactly how the system works and that there's no promise of what the district court can do. That was translated. He signed it. He agreed that he had discussed it with his client. He understood it. He signed it. You have a Rule 11 colloquy with the same protections. An interpreter is there. The court questions him at every step of the way. He understands. And, in fact, there's one point that's kind of interesting in the Rule 11 colloquy, where he has a problem with something. And the proceedings stop. He discusses it with Mr. Coburn. They correct something that was in the stipulated facts. He's not passively sitting by and just saying, uh-huh, uh-huh, uh-huh. He is involved. He's understanding. And so there would be really no other way to say that, despite everything that's on the record, he didn't get it. And, of course, that hearing testimony in addition doesn't support that. So there's all these questions about whether the lawyers misgaged how their message would be received by him. Then there's also the separate question of these lawyers just completely missing the fact that the pre-sentencing report, PSR, was going to actually argue for or recommend a much higher guidelines range because it was going to factor in the drugs used by the other defendants and relations, I guess. They completely missed that, didn't ever factor that in. And it seems to me pretty clear that that is what had the upward pull on the district court heading to the top of the guidelines range here. Was that ineffective not to at least foresee that and deal with that? Two responses to that, Your Honor. First of all, I don't read the record in the same way to say that the PSR's guidelines, which the court did not then use, was the reason for the upward pull. These were very serious crimes. These were recorded conversations, negotiations with an undercover that involved 50 to 100 kilograms of cocaine and 50 kilograms of heroin. So this is a very serious offense. That's in the basic conspiracy, right? Right. The PSR goes to a completely different conspiracy, as I understand it. Well, each of these co-defendants were involved in one was the cocaine case and one was the heroin case. Yeah, but they all got the low guidelines. That's the problem here. They all got the low guidelines even though they were engaged in serious offenses as well. But not as serious as this defendant. He was involved in both. I get that. And he was a leader. So I don't agree that it was the PSR's calculation of the guidelines that was the upward pull. Was it ineffective to sort of set all this stuff up and saying, okay, there's going to be this PSR reprocess, court will have discretion, but not knowing going in that there was going to be a lot more, not warning him that unlike these other defendants, there was going to be a lot more action here that could push the court to the top of the guidelines range. So without having factored in the pressure or even just the comparative measure a judge is going to make in culpability between you and these other folks that it was wrong one not to deal with that. Did they challenge the PSR? They didn't. And then the government did. The government did. So how's that for? So they didn't initially, but then it was discussed at the first scheduled sentencing hearing and defense counsel said this is very serious, can we brief it? So then there was briefing on it and then there was discussion of it. And the court ultimately said, I'm going to use the guidelines range that the parties agreed to. The second fact, though, is that this was not, this was, according to the court, a novel issue. And the novel issue was this. The question wasn't just relevant conduct. The question is the government entered into an agreement with each of these co-conspirators, again, to a stipulated guidelines range. And that's what they agreed, that's what they pleaded to at their Rule 11 colloquies. Could the court use what they said in calculating this defendant's guidelines range? And the court said, this is a novel issue, I've never seen this before. So it's hard to see that that could be deficient performance when, even according to the court, this is something that hasn't come up. But then, of course, the court said, I'm not going there. I think what's a fair sentence is something within the range that the parties agreed to and that's what I'm going to give the defendant. It's February, right? February 15th, Your Honor. And Mr. Sussman, I have discussed this. And as we said, one must be careful what one wishes for. Thank you. Mr. Sussman, I'll give you another two minutes. All right, we'll take the matter under submission. Mr. Sussman, you are appointed by the court. We're grateful for your service.
judges: Garland, Millett, Williams